SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Township of Jackson v. Getzel Bee, LLC** (A-3-25) (090404)

**Argued March 16, 2026 -- Decided July 20, 2026**

**CHIEF JUSTICE RABNER, writing for a unanimous Court.**

In this appeal, the Court considers whether the Township of Jackson properly used the power of eminent domain -- which allows the government to take land from private property owners for a public purpose -- to condemn privately owned property and then transfer it to a developer. The developer, in exchange, transferred other land to the Township for use as open space.

The Township condemned Lots 84 and 90, owned by defendants Bellevue Jackson, LLC and Getzel Bee, LLC, respectively, in a series of four ordinances. The first two ordinances described the land swap agreement. They enabled the Township to exchange land it owned as well as land it did not, including Lots 84 and 90, with a private developer that would, in turn, transfer property it owned to the town. The ordinances did not specify how Lots 84 and 90 would be used once the exchange was completed. Nor did they identify any public purpose related to the exchange. Between the first and second ordinances, the Township sent letters to the respective owners of Lots 84 and 90, notifying them that the town was "in the process of acquiring substantial acreage for open space purposes" and would have their properties appraised. After the second ordinance, the Township offered to pay the owners the appraised value of their respective properties.

The third ordinance authorized the "acquisition" of Lots 84 and 90 "so that the Township and other entities" acting on its behalf "shall have access onto, over and through said privately owned real property for the purpose of open space." (emphases added). The ordinance also found "that the acquisition will promote and protect the health, safety, and welfare of residents of the Township." A month after adopting the third ordinance, the Township filed complaints to condemn the lots, asserting that it needed the properties "to [e]ffect a land exchange for the preservation of open space." Finally, the fourth ordinance repeated language from the third but also stated that the condemnation "will permit the Township to exchange the subject properties, along with surrounding properties, to protect and maintain open space within the Township." The Township thus intimated for the first time, more than seven months after the first ordinance, that Lots 84 and 90 might not be used for open space.

1

The trial court concluded the taking was "for a public purpose" and issued orders that would allow the condemnation to proceed. The court declined the owners' motions to stay the orders pending appeal, as did the Appellate Division. On appeal, the Appellate Division reversed. The Court granted certification. 261 N.J. 554 (2025).

**HELD:** Neither the statutes that govern condemnation proceedings, nor case law from the United States Supreme Court or this State, authorize the type of land swap that took place here -- condemning someone's land only to exchange it for property of another that would be put to public use. Further, the Township did not act forthrightly in dealing with the owners of the private land it condemned.

1. Eminent domain is the power of the State to take private property for public use. That authority stems from the Fifth Amendment to the United States Constitution and Article I, Paragraph 20 of the New Jersey Constitution. The State Constitution also authorizes the Legislature to grant the power of eminent domain to agencies of the state and to local governments. N.J. Const. art. IV, § 6, ¶ 3. Entities like the Township that are given that authority must abide by the Federal and State Constitutions, the Local Lands and Buildings Law (LLBL), and the Eminent Domain Act (EDA). The LLBL empowers counties and municipalities to acquire private property through condemnation and other means. N.J.S.A. 40A:12-2(a), -4. A municipality may also "exchange any lands" it owns for other property "desired for public use." Id. at -16. The EDA outlines the process condemning authorities, acting "pursuant to law," must follow to acquire private property. N.J.S.A. 20:3-6. Rules 4:73-1 to -11 further outline the condemnation process and follow the requirements of the EDA. (pp. 11-13)

2. Governmental bodies can take private property only for a public use. Courts have struggled to define the phrase "public use" in the abstract. Some courts have read the term narrowly and limited it to mean that the property acquired by eminent domain must actually be used by the public or that the public must have the opportunity to use the property taken. Courts that take a broader view define public use as "public purpose" or "public advantage." Like the United States Supreme Court and a majority of state courts, New Jersey has adopted the broader view. The Court reviews relevant cases from the Supreme Court and New Jersey courts, which have recognized economic development and the preservation of open public space as public uses. The Court also notes that the Supreme Court of Utah, in rejecting a proposed taking to effectuate a land swap, explained, relying on state statutory law, that "[i]t is not enough to accomplish a public use on some property; the condemnor must satisfy the public use requirement on the property subject to the condemnation." Salt Lake City Corp. v. Evans Dev. Grp., LLC, 369 P.3d 1263, 1267 (Utah 2016). (pp. 14-20)

3. Turning to the proposed exchange of private property in this appeal, the Court reviews key provisions of the LLBL and the EDA and explains that neither statute supports the proposed taking. Here, the Township condemned private property, Lots 84 and 90, but had no intention to use either lot for a public purpose. Instead, it

2

exchanged the condemned parcels for property a private developer owned. Lots 84 and 90 were left to be used in the developer's discretion. They were not restricted for public use as open space, and nothing in the record suggests they were to be used in that manner. Case law similarly does not support condemning private property to facilitate the kind of land swap in this case. Hawaii Housing Authority v. Midkiff, for example, involved taking private property to upend the negative effects of a land oligopoly. 467 U.S. 229, 241-42 (1984). Even though the condemned land was conveyed to a private party, the transfer itself furthered a public purpose. And the proposed taking of private properties in Kelo v. City of New London was part of an integrated development plan. 545 U.S. 469, 474 (2005). The fact that a limited number of properties within the development area were to be transferred to a private entity did not undermine the taking's public purpose. Id. at 474-75. Similarly, in Berman v. Parker, part of the condemned land was to be leased or sold to private parties for redevelopment. 348 U.S. 26, 30 (1954). (pp. 20-22)

4. The takings here are of a different character. The condemned private properties were not part of an area to be set aside for public use. The developer's properties were. The compelled transfer from private owner to private developer -- from A to B, as Kelo said with disapproval -- can raise questions about whether "a private purpose was afoot." 545 U.S. at 486-87. Condemning private property in that way, without strictly adhering to the public purpose requirement, could potentially lead to abuse. The practice could also stray from a basic constitutional principle -- that private property must only be taken for a public use. (pp. 22-23)

5. When the government interacts with the public, it must turn square corners. In condemnation matters, the government must deal forthrightly and fairly with property owners. Governmental entities, in other words, are obliged to act with compunction and integrity. The Court reviews in detail the evolving language in the ordinances and explains how the Township fell short of those standards. (pp. 23-25)

6. Counsel for the Township represents that, by the time the Appellate Division reversed the trial court's orders allowing the condemnation to proceed, the exchange of land between the Township and the developer had taken place. Courts have equitable powers to fashion appropriate and just relief tailored to specific disputes. The Court remands to the trial court to determine what relief should be granted. (pp. 25-26)

   **AFFIRMED and REMANDED to the trial court.**

**JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in CHIEF JUSTICE RABNER's opinion.**

Township of Jackson, a
municipal corporation in the
County of Ocean, State of
New Jersey,

Plaintiff-Appellant,

v.

Getzel Bee, LLC,

Defendant-Respondent,

and

State of New Jersey,

Defendant.

Township of Jackson, a
municipal corporation in the
County of Ocean, State of
New Jersey,

Plaintiff-Appellant,

v.

Bellevue Jackson, LLC,

Defendant-Respondent,

and

State of New Jersey,

Defendant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
480 N.J. Super. 592 (App. Div. 2025).

| Argued | Decided |
|---|---|
| March 16, 2026 | July 20, 2026 |

Kelsey A. McGuckin-Anthony argued the cause for appellant (Dasti, McGuckin, McNichols, Connors, Anthony & Buckley, attorneys; Jerry J. Dasti and Kelsey A. McGuckin-Anthony, of counsel and on the briefs).

Richard P. DeAngelis, Jr., argued the cause for respondents (Connell Foley, attorneys; Richard P. DeAngelis, Jr., of counsel and on the brief, and Meredith S. Rubin, on the brief).

Rudy Randazzo submitted a brief on behalf of amicus curiae Casino Reinvestment Development Authority (Riker Danzig, attorneys; Stuart M. Lederman, of counsel and on the brief, and Rudy Randazzo and Daniel MacLane, on the brief).

Jonathan M. Houghton submitted a brief on behalf of amicus curiae Pacific Legal Foundation (Pacific Legal Foundation, attorneys; Jonathan M. Houghton and Bridget F. Conlan a member of the Illinois, Colorado, and Wyoming bars, admitted pro hac vice, on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

Under the Federal and State Constitutions, the government may take private property from owners, without their consent, under limited circumstances. U.S. Const. amend. V; N.J. Const. art. I, ¶ 20. Among other limits, municipalities can only use the immense power of eminent domain to condemn private property for a public purpose. They cannot take someone's private land for a private use.

In this appeal, the Township of Jackson condemned privately owned property. The Township then transferred the land to a developer without restricting how it could be used. In exchange, the developer transferred other land to the Township for use as open space. To be clear, it was the developer's land -- and not the land the Township had condemned -- that would be used for a public purpose.

Neither the statutes that govern condemnation proceedings, nor case law from the United States Supreme Court or this State, authorize the type of land swap that took place here -- condemning someone's land only to exchange it for property of another that would be put to public use. We also find that the Township did not act forthrightly in dealing with the owners of the private land it condemned.

For those reasons, we affirm the judgment of the Appellate Division, which reversed the trial court's orders that authorized the takings. We also

3

remand to the trial court to determine what relief should be granted to the owners whose properties were improperly taken from them.

## I.

To recount the facts, we draw on the record submitted to the trial court. No evidentiary hearing was held.

## A.

Lots 84 and 90 on the Township of Jackson's tax map lie at the center of this appeal. They were owned, respectively, by defendant Bellevue Jackson, LLC and defendant Getzel Bee, LLC (the owners or LLCs). The Township adopted a series of ordinances in an effort to acquire both properties.

Ordinance 5-23, the first of four ordinances, was adopted on February 14, 2023. Its purpose was to enable the town to exchange land it owned as well as land it did not -- "Lots 84, 90, 103 and 112" -- with a private developer, Bellevue Estates, LLC. (Bellevue Jackson, LLC and Bellevue Estates, LLC are not related.) The developer, in turn, would transfer property it owned, Lots 58 and 58Q, to the town. The ordinance cited N.J.S.A. 40A:12-16 as authority for the proposed land exchange.[1] The ordinance did not

---

[1] As discussed later, N.J.S.A. 40A:12-16 empowers counties and municipalities to exchange any land "owned by the county or municipality . . . for other lands or rights or interests therein desired for public use." (emphasis added).

specify how Lots 84 and 90 would be used once the exchange was completed. Nor did it identify any public purpose related to the exchange.

Days later, the Township entered into a contract with the developer to make the land swap.[2] Lots 84 and 90 were among several dozen parcels the town was to convey.

On March 13, 2023, the Township sent letters to the respective owners of Lots 84 and 90. It notified the owners that the town was "in the process of acquiring substantial acreage for open space purposes." The Township added that it would have the property appraised and would provide a purchase price afterward. If an agreement could not be reached, the Township advised that it would institute eminent domain proceedings.

The Township adopted a second ordinance, Ordinance 7-23, on March 28, 2023. The amended ordinance added an additional tax lot to the exchange. It recounted that the Township would transfer properties including Lots 84 and 90, which it did not own, to the developer, in return for Lots 58 and 58Q. The

---

[2] The developer initially sought to construct private religious schools on the land it owned. The resulting contract to swap the land was the subject of a separate lawsuit, which we do not address. See Township of Jackson v. Getzel Bee, LLC, 480 N.J. Super. 592, 600-01 (App. Div. 2025). This appeal focuses on the Township's efforts to take Lots 84 and 90 through eminent domain.

second ordinance, like the first one, did not identify how Lots 84 and 90 would be used or list any public purpose for the exchange.

In a letter dated April 12, 2023, the Township offered to pay the owners the appraised value of their respective properties.

The Township adopted a third ordinance, Ordinance 15-23, on May 9, 2023. It authorized the "acquisition" of Lots 84 and 90 either by an "arm's length transaction or, if necessary, by condemnation/eminent domain" in "furtherance of a public use and purpose." In a preliminary clause, the ordinance explained the reason for the acquisition: "so that the Township and other entities" acting on its behalf "shall have access onto, over and through said privately owned real property for the purpose of open space." (emphases added). The ordinance also found "that the acquisition will promote and protect the health, safety, and welfare of residents of the Township."

On June 9, 2023, the Township filed separate complaints to condemn Lots 84 and 90 under the Local Lands and Buildings Law (LLBL), N.J.S.A. 40A:12-1 et seq., and the Eminent Domain Act (EDA), N.J.S.A. 20:3-1 et seq. The complaints asserted that the Township needed to acquire the properties "to [e]ffect a land exchange for the preservation of open space." In their answers, the owners claimed the takings were "solely for a private benefit with no public purpose."

6

The Township next adopted a fourth ordinance, Ordinance 26-23, on September 26, 2023.  This ordinance repeated that the town needed to acquire Lots 84 and 90 so that it would "have access onto, over and through said privately owned" lots "for the purpose of open space."  Yet the ordinance also stated that the condemnation "will permit the Township to exchange the subject properties, along with surrounding properties, to protect and maintain open space within the Township."  The ordinance added that "[t]he land exchange, with the inclusion of [Lots 84 and 90], will permit the township to preserve open space in a desirable . . . centrally located portion of the Township."  With that language, the Township intimated for the first time that Lots 84 and 90 might not be used for open space.

B.

On October 20, 2023, the trial court heard oral argument from the parties on the Township's complaint for condemnation.  Afterward, the court concluded the taking was "for a public purpose."  The court then entered orders that stated the Township had "duly exercised its power of [e]minent [d]omain" for the public purpose stated in the respective complaints.  The orders appointed commissioners to appraise Lots 84 and 90 and determine the amount of compensation to be paid.  Shortly after, the trial court denied the owners' motions to stay the orders pending appeal.  The Appellate Division

7

did likewise several weeks later.  The owners also appealed the October 20, 2023 orders on the merits.[3]

## C.

The Appellate Division reversed the trial court's judgment.  In a consolidated opinion, the appellate court held that "the trial court's approval of the condemnation action contravene[d]" United States Supreme Court precedent as well as "the requirement of [the] Eminent Domain Act that any condemned property must be put to an articulated public purpose."  Township of Jackson v. Getzel Bee, LLC, 480 N.J. Super. 592, 606-07 (App. Div. 2025).  Here, instead, the Appellate Division found the condemned lots were, "in essence, currency, to exchange for open space."  Id. at 603.

The appellate court noted there was no "limitation or restriction on the Developer's use of the condemned property and none of the ordinances state[d] the intended use of Lots 84 and 90."  Ibid.  A careful reading of the final ordinance, the court observed, "demonstrates it is [the] Developer's land,

---

[3]  The orders enabled the condemnation process to continue.  Although the record does not include details of what happened afterward, which the parties were not required to provide, we understand from their briefs that the properties were, in fact, taken and ultimately transferred to the developer.  Like the Appellate Division, we refer to Lots 84 and 90 as condemned properties.

acquired through the land-swap deal, that will be used for open space." Id. at 606.

The Appellate Division also noted that "the Township did not 'turn square corners' in its interactions with the LLC[s]." Id. at 609. The court found the representations in the first ordinance were "pretextual" and did not make clear the condemned lots were "not for open space, but to exchange" in the "land-swap deal." Id. at 610.

D.

We granted the Township's petition for certification. 261 N.J. 554 (2025). We also granted the Casino Reinvestment Development Authority (CRDA) and the Pacific Legal Foundation (PLF) leave to appear as friends of the court.

II.

The Township maintains it "was fully within its rights . . . to acquire property for a public purpose," namely, to preserve open space for its residents. The Township argues that the Appellate Division "failed to review the condemnation action as a whole" and give deference to the Township's determination that the overall plan preserved open space. The Township also submits the condemnation plan was consistent with precedent.

9

Focusing on the fourth ordinance, the Township disputes that it failed to turn "square corners" in its negotiations with the owners. It also points out that it no longer owns or controls the properties in question.

CRDA contends the ruling of the Appellate Division should be reversed. CRDA has the power "[t]o exercise the right of eminent domain in the city of Atlantic City." N.J.S.A. 5:12-161(p). It submits that condemnation can be an expensive, complex process. CRDA argues that costs could be reduced if it "were permitted to condemn land and then trade it for property more suitable to the agency's redevelopment goals."

The owners of Lots 84 and 90 ask the Court to uphold the judgment of the Appellate Division. They maintain the appellate court's ruling was consistent with federal and state case law. They also contend the Township's stated purpose of preserving open space was pretextual and lacks support in the record.

The owners note that statements in multiple ordinances the Township adopted support a finding that it failed to turn "square corners." Finally, they submit that the issue of remedy is not before the Court at this time.

PLF's arguments support the owners' position. PLF contends that "private developers cannot barter for the use of the government's eminent domain power . . . by offering a public use elsewhere" via a trade. The

Foundation presents examples of abuses that, in its view, could result from such a practice. PLF also maintains that the Court can order appropriate relief even if the Township has transferred title of the properties to the developer.

III.

A.

"Eminent domain is the power of the State to take private property for public use." Township of West Orange v. 769 Assocs., L.L.C., 172 N.J. 564, 571 (2002) (quoting State v. Lanza, 27 N.J. 516, 529 (1958)). That authority stems from the text of the Federal and State Constitutions: "[N]or shall private property be taken for public use, without just compensation," U.S. Const. amend. V; and "Private property shall not be taken for public use without just compensation," N.J. Const. art. I, ¶ 20.

Those commands establish "several important constitutional limits: the property acquired must be taken for a 'public use,' the State must pay 'just compensation' in exchange for the property, and no person shall be deprived of . . . property without due process of law." 769 Assocs., 172 N.J. at 572; accord Gallenthin Realty Dev., Inc. v. Borough of Paulsboro, 191 N.J. 344, 356 (2007).

The State Constitution also authorizes the Legislature to grant the power of eminent domain to agencies of the state and to local governments. N.J.

11

Const. art. IV, § 6, ¶ 3. Entities like the Township that are given that authority must abide by the Federal and State Constitutions, the Local Lands and Buildings Law, and the Eminent Domain Act.

The LLBL empowers counties and municipalities to acquire private property through condemnation and other means. N.J.S.A. 40A:12-2(a), -4. The law directs municipalities to proceed by ordinance to do so. Id. at -5(a). If an acquired property "become[s] unsuited or inconvenient for the use . . . it was acquired" for, the governing body may later convert it to another public use. Id. at -5(c). A municipality may also "exchange any lands" it owns for other property "desired for public use." Id. at -16.

The EDA outlines the process condemning authorities, acting "pursuant to law," must follow to acquire private property. N.J.S.A. 20:3-6. To begin, the EDA requires the condemnor to negotiate with the owner and make an offer. Ibid. The condemnor must first appraise the property and allow the owner "to accompany the appraiser during [the] inspection." Ibid. The written offer must identify the property to be acquired, the amount of compensation offered, and the manner used to determine the amount. Ibid. If an agreement cannot be reached, the condemnor must file a complaint that describes the property and seek an order to appoint three "commissioners to fix the compensation required to be paid." Id. at -8, -10.

12

Rules 4:73-1 to -11 further outline the condemnation process and follow the requirements of the EDA. City of Atlantic City v. Cynwyd Invs., 148 N.J. 55, 68 (1997); Pressler & Verniero, Current N.J. Court Rules, cmt. 1 to R. 4:73-1 (2026).

B.

Condemning authorities have discretion to determine what property should be taken for a public use. 769 Assocs., 172 N.J. at 572; Tex. E. Transmission Corp. v. Wildlife Pres., Inc., 48 N.J. 261, 269 (1966); Burnett v. Abbott, 14 N.J. 291, 294 (1954). Courts do not interfere with "[t]he exercise of that discretion" absent "fraud, bad faith or circumstances revealing arbitrary or capricious action." Tex. E. Transmission Corp., 48 N.J. at 269.

We also generally give deference to the legislature's judgment as to what constitutes a public use. Haw. Hous. Auth. v. Midkiff, 467 U.S. 229, 244 (1984); 769 Assocs., 172 N.J. at 576. But the concept of "public use" may implicate broader issues. To the extent they raise constitutional issues or questions of statutory interpretation, our review is de novo. See Krug v. State Parole Bd., 261 N.J. 477, 485-86 (2025). For guidance on the meaning of "public use," we turn to settled case law.

IV.

Governmental bodies cannot take private property for a purely private use.  Midkiff, 467 U.S. at 245.  Instead, as the constitutional provisions quoted above make clear, private property may only be taken for a "public use."  U.S. Const. amend. V; N.J. Const. art. I, ¶ 20.

Courts have struggled to define the phrase "public use" in the abstract because it "is incapable of a precise and comprehensive definition of universal application."  County of Essex v. Hindenlang, 35 N.J. Super. 479, 488 (App. Div. 1955) (quotation omitted); accord 2A Nichols on Eminent Domain § 7.02 (2026) ("The definition of the phrase 'public use' . . . does not have a precise and fixed meaning.").

Some courts have read the term narrowly and limited it to mean "that the property acquired by eminent domain must actually be used by the public or that the public must have the opportunity to use the property taken."  Nichols § 7.02[2]; see also Hindenlang, 35 N.J. Super. at 489.  Courts that take a broader view "define[] 'public use' as 'public purpose' or 'public advantage.'"  Nichols § 7.02[3]; see also Hindenlang, 35 N.J. Super. at 488-89; State Highway Comm'r v. Totowa Lumber & Supply Co., 96 N.J. Super. 115, 119 (App. Div. 1967).  Like the United States Supreme Court and a majority of state courts,

14

see 2A Nichols § 7.02[5], we have adopted the broader view, <u>Norfolk S. Ry.</u> <u>Co. v. Intermodal Prop.</u>, 215 N.J. 142, 161 (2013).

Several notable rulings by the United States Supreme Court shed light on the meaning of the phrase.  In <u>Berman v. Parker</u>, the Court upheld a redevelopment plan in the District of Columbia that provided for the condemnation of private property in an area Congress determined was "blighted."  348 U.S. 26, 29, 36 (1954).  The condemned land was "to be devoted to such public purposes as streets, utilities, recreational facilities, and schools," as well as "low-rent housing."  <u>Id.</u> at 30-31.

The owner of a department store whose property was marked for taking challenged the comprehensive plan.  <u>Id.</u> at 31.  In rejecting that claim, the Court relied on a "broad and inclusive" "concept of the public welfare" that encompassed healthy, clean, sanitary, and safe conditions.  <u>Id.</u> at 33.  As the Court later observed, the public use extended beyond the "removal of blight," under an integrated plan, "to encompass" the creation of "conditions that would prevent a reversion to blight in the future."  <u>Kelo v. City of New</u> <u>London</u>, 545 U.S. 469, 484 n.13 (2005) (citing <u>Berman</u>, 348 U.S. at 34-35).

Later, in <u>Midkiff</u>, the Court upheld a condemnation scheme the Hawaii Legislature enacted "to reduce the perceived social and economic evils of a land oligopoly."  467 U.S. at 241-42.  From the time the Hawaiian Islands

15

were first settled, Polynesian immigrants created "an economy around a feudal land tenure system." Id. at 232. In an attempt to break up large estates and reduce the concentration of land ownership, the Hawaii Legislature enacted a land reform scheme to condemn large private tracts and transfer ownership of smaller parcels to existing tenants/lessees. Id. at 232-34.

The Court concluded the act was constitutional and amounted to "a rational exercise of the eminent domain power." Id. at 241-43. In essence, attempting to address the "perceived evils of concentrated property ownership" satisfied the public use requirement. Id. at 245. "The mere fact that property taken outright by eminent domain" was to be "transferred in the first instance to private beneficiaries [did] not condemn that taking as having only a private purpose." Id. at 243-44.

More recently, the Supreme Court evaluated "whether a city's decision to take property for the purpose of economic development satisfies the 'public use' requirement of the Fifth Amendment." Kelo, 545 U.S. at 477. The development plan was designed to create jobs, "increase tax and other revenues, and . . . revitalize an economically distressed" area. Id. at 472. To assemble the land needed for the project, the city sought to use eminent domain to acquire property from owners who did not want to sell their land.

Ibid.  Certain parcels subject to condemnation were to be transferred to a private company.  Id. at 474-75, 476 n.4.

As a starting point, the Court identified two "polar propositions":

> On the one hand, it has long been accepted that the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation.  On the other hand, it is equally clear that a State may transfer property from one private party to another if future "use by the public" is the purpose of the taking . . . .
>
> [Id. at 477.]

Regarding the first proposition, the Court explained that to take property in order to confer "a private benefit on a particular private party" "would no doubt be forbidden."  Ibid. (citing Midkiff, 467 U.S. at 245).  "[T]o take property under the mere pretext of a public purpose, when [the] actual purpose was to bestow a private benefit," would likewise not be allowed.  Id. at 478.

As to the second proposition, the Court pointed out that the city was not "planning to open the condemned land -- at least not in its entirety -- to use by the general public."  Ibid.  But that narrow view, the Court explained, had been rejected "long ago."  Id. at 479 (quoting Midkiff, 467 U.S. at 244).  A "broader and more natural interpretation of public use" had taken its place -- whether a taking serves a "public purpose."  Id. at 480.

17

Under that framework, the Court noted, it had upheld takings to "transform[] a blighted area into a 'well-balanced' community through redevelopment," to break up a land oligopoly, and to "eliminat[e] a 'significant barrier to entry in the pesticide market.'" Id. at 484-85 (first quoting Berman, 348 U.S. at 33; then citing Midkiff, 467 U.S. at 242; and then quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1015 (1984)). "Promoting economic development," the Court held, was no different from those "other public purposes." Id. at 484. Moreover, the Court held that challenges brought by individual owners are to be resolved "in light of the entire plan," "not on a piecemeal basis." Ibid.

The Court, however, distinguished a city's effort to transfer property from A to B because B would "put the property to a more productive use." Id. at 486-87. "Such a one-to-one transfer of property, executed outside the confines of an integrated development plan, . . . would certainly raise a suspicion that a private purpose was afoot . . . ." Id. at 487.

In the end, the Supreme Court concluded that the proposed takings, as part of an integrated economic development plan, were "for a 'public use'" under the Federal Constitution. Id. at 490. The Court also acknowledged that States may place "further restrictions on [the] exercise of the takings power." Id. at 489.

18

This Court has recognized that municipalities may exercise the power of eminent domain to acquire private property in order to preserve open space. Mount Laurel Township v. MiPro Homes, L.L.C., 188 N.J. 531, 533 (2006). The Appellate Division's earlier ruling in the case reviewed a series of legislative acts which recognized that the "preservation of open space constitutes a public use." Mount Laurel Township v. MiPro Homes, L.L.C., 379 N.J. Super. 358, 371-73 (App. Div. 2005). The appellate court concluded that a town could exercise its authority "to slow down residential development," even without a plan in place "to put the property to any active [recreational] use." Id. at 362, 373. We affirmed the judgment in a brief per curiam opinion. MiPro, 188 N.J. at 533.

We note one other decision by the Supreme Court of Utah, which rejected a proposed taking. Salt Lake City Corp. v. Evans Dev. Grp., LLC, 369 P.3d 1263 (Utah 2016). The appeal involved the condemnation of property to exchange it for land that would be put to a public use. Id. at 1265. In order to improve traffic circulation and decrease noise and pollution, the city needed to acquire land owned by Rocky Mountain Power and permanently remove railroad lines on the property. Ibid. The power company agreed to transfer the property in exchange for land on which it could construct a substation. Id. at 1265-66. To accomplish that, the city attempted to condemn private land

19

owned by a third party, Evans Development Group, LLC. Id. at 1266. Evans, in turn, sought to prevent the taking of its land. Ibid.

The Utah Supreme Court reversed the judgment to condemn Evans's property. The Court found that the "property exchange [did] not satisfy" the public use requirement of Utah's eminent domain statutes. Ibid. As the Utah Supreme Court explained, "[i]t is not enough to accomplish a public use on some property; the condemnor must satisfy the public use requirement on the property subject to the condemnation." Id. at 1267.

V.

With those principles in mind, we turn to the proposed exchange of private property in this appeal. As noted above, the LLBL empowers municipalities to condemn private land for a public purpose, such as open space, and the EDA outlines the condemnation process. Neither statute, however, supports the proposed taking in this matter. Here, the Township condemned private property, Lots 84 and 90, but had no intention to use either lot for a public purpose. Instead, it exchanged the condemned parcels for property a private developer owned. Lots 84 and 90 were left to be used in the developer's discretion. Getzel Bee, LLC, 480 N.J. Super. at 603. They were not restricted for public use as open space, and nothing in the record suggests they were to be used in that manner.

20

The EDA does not contemplate such a land swap. Under the statute, to "'[c]ondemn' means to take private property for a public purpose." N.J.S.A. 20:3-2(a). Similarly, a "[c]ondemnor" is an "entity . . . which is condemning private property for a public purpose under the power of eminent domain." Id. at -2(b). Armed with that authority, a condemnor may seek "to acquire property pursuant to law." Id. at -6. But nowhere does the law authorize the proposed taking here -- condemning someone's land only to swap it for property of another that will be used for a public purpose. See Getzel Bee, LLC, 480 N.J. Super. at 605. Under such an arrangement, the condemned property merely serves as "currency" for the exchange. Id. at 603.

The LLBL likewise provides no authority for this type of land exchange. The law, for example, empowers any county or municipality to acquire property "for the performance of its functions," N.J.S.A. 40A:12-3, or "for the proper exercise of" its powers, id. at -4(b). More generally, the LLBL empowers governing bodies to exchange "any lands . . . owned by the county or municipality." Id. at -16 (emphasis added). But the statute does not authorize towns to swap private property they do not own or to condemn private property for the type of land exchange here.

Case law similarly does not support condemning private property to facilitate the kind of land swap in this case. Midkiff, for example, involved

21

taking private property to upend the negative effects of a land oligopoly. 467 U.S. at 241-42. Even though the condemned land was conveyed to a private party, the transfer itself furthered a public purpose.

The proposed taking of private properties in Kelo was part of an integrated development plan. 545 U.S. at 474. The fact that a limited number of properties within the development area were to be transferred to a private entity did not undermine the taking's public purpose. Id. at 474-75. Similarly, in Berman, part of the condemned land was to be leased or sold to private parties for redevelopment. 348 U.S. at 30.

The takings here are of a different character. The condemned private properties were not part of an area to be set aside for public use. The developer's properties were. That invites several questions. Why didn't the town condemn the developer's land outright or exchange land the town already owned? The compelled transfer from private owner to private developer -- from A to B, as Kelo said with disapproval -- can raise questions about whether "a private purpose was afoot." 545 U.S. at 486-87.

And if it were permissible for a town to condemn property for use in a land swap that might serve a public purpose elsewhere, what if any limits would apply? Could a municipality take private property from anywhere within the city's limits to broker a public purpose in another part of town?

22

Condemning private property in that way, without strictly adhering to the public purpose requirement, could potentially lead to abuse. The practice could also stray from a basic constitutional principle -- that private property must only be taken for a public use.

VI.

We also agree with the Appellate Division that the Township did not act forthrightly or fairly with the owners of Lots 84 and 90. Getzel Bee, LLC, 480 N.J. Super. at 609-10.

When the government interacts with the public, it "must 'turn square corners.'" F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426 (1985) (quoting Gruber v. Mayor & Twp. Comm. of Raritan, 73 N.J. Super. 120, 127 (App. Div. 1962)). In condemnation matters, the government must "deal forthrightly and fairly with property owners." Ibid.; see also Citizens for Equity v. Dep't of Env't Prot., 126 N.J. 391, 397 (1991) (reviewing agency action). Governmental entities, in other words, are obliged to act "with compunction and integrity." F.M.C., 100 N.J. at 427.

The evolving language in the ordinances fell short of those standards. We consider the range of the Township's efforts to condemn Lots 84 and 90, beginning with the initial ordinance in February 2023.

23

The first two ordinances specified that "it would be in the best interest of the municipality to exchange the lands it owns" with a private developer. Both ordinances also referred to Lots 84 and 90, which the Township did not yet own. Neither ordinance stated how any properties would be used or identified any public purpose tied to the proposed exchange. A letter from counsel to the owners one month after the first ordinance contained only this reference: "The Township is in the process of acquiring substantial acreage for open space purposes."

The third and fourth ordinances, adopted on May 9, 2023 and September 26, 2023, announced that the Township had decided to acquire Lots 84 and 90 through eminent domain, if necessary. The ordinances also declared the purpose of the taking: "so that the Township . . . shall have access onto, over and through said privately owned property for the purpose of open space." (emphasis added). That statement was at odds with the "Contract for Exchange of Real Estate" between the Township and the developer, dated February 21, 2023. The contract made clear, as the Appellate Division noted, that "the Township planned to use the lots not for open space, but to exchange for the Developer's land." Getzel Bee, LLC, 480 N.J. Super. at 610. As a result, neither the Township nor its residents would be able to walk on, over, or through Lots 84 and 90.

24

The fourth ordinance added a finding that the acquisition of Lots 84 and 90 was "in the furtherance of a public use and purpose." The ordinance also publicly stated for the first time that the Township had entered into a land exchange whose "purpose . . . [was] to provide open space." Yet months earlier, without revealing those details, the Township asked the property owners to respond to letters about the taking of their property. The public was similarly unable to fully evaluate multiple ordinances presented at earlier public meetings.

As is now clear, neither private parcel was to be used for public space. After the Township acquired the properties by condemnation, both would be transferred to, and belong to, the developer for whatever lawful use it saw fit.

The above series of events reveals that the Township did not act forthrightly or turn square corners in its dealings with the LLCs. The asserted public purpose for the taking was, at times, vague, inaccurate, and pretextual. See Getzel Bee, LLC, 480 N.J. Super. at 610.

## VII.

As noted above, the trial court found that the Township had "duly exercised its power of [e]minent [d]omain." As a result, the court entered orders that empowered commissioners to proceed with the condemnation

25

process. The trial court and the Appellate Division then denied the LLCs' motions to stay the orders pending appeal.

The Appellate Division later reversed the trial court's judgment and declared "the land-swap agreement [was] not enforceable as to Lots 84 and 90." Id. at 598. Counsel for the Township represents that, by that time, the exchange of land between the Township and the developer had taken place. According to counsel, the Township no longer owns or controls Lots 84 and 90.

We are not in a position to address the question of remedy. We do not know what, if anything, has happened to Lots 84 and 90 since they were transferred to the developer. We note as well that the issue of remedy was not raised before the Appellate Division, and the petition for certification did not present legal argument on the issue.

Courts have equitable powers to fashion appropriate and just relief tailored to specific disputes. Kaye v. Rosefielde, 223 N.J. 218, 231 (2015) (citing cases). We remand to the trial court to consider and determine what relief should be granted.

## VIII.

For the reasons set forth above, we affirm the judgment of the Appellate Division and remand the matter to the trial court for further proceedings consistent with this opinion.

JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, NORIEGA, and HOFFMAN join in CHIEF JUSTICE RABNER's opinion.